1  Alan H. Blankenheimer (SBN 218713)
   ablankenheimer@cov.com
2  Christopher K. Eppich (SBN 228025)
   ceppich@cov.com
3  COVINGTON & BURLING LLP
   9191 Towne Centre Drive, 6th FL
4  San Diego, CA 92122
   Telephone: (858) 678-1800
5  Facsimile: (858) 678-1600

6  Attorneys for Plaintiff,
   DTS, INC.

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  WESTERN DIVISION

11

12  DTS, INC.,                          Case No. _____

13  a Delaware corporation,             **COMPLAINT FOR TRADEMARK
                                        INFRINGEMENT, DILUTION OF
14              Plaintiff,              TRADEMARK, FALSE
                                        DESIGNATION OF ORIGIN,
15      v.                              UNFAIR COMPETITION, AND
                                        BREACH OF CONTRACT**
16  NERO AG,
                                        **DEMAND FOR JURY TRIAL**
17  a German corporation,

18              Defendant.

19

20

21

22

23

24

25

26

27

28

SD: 16421-1                            COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff DTS, Inc. ("DTS"), for its Complaint against Defendant NERO AG ("NERO"), alleges as follows:

## NATURE OF THE ACTION AND RELIEF SOUGHT

1.     DTS brings this action against NERO for trademark infringement, dilution of trademark, false designation of origin and unfair competition in violation of Sections 32 and 43(a) of the Federal Trademark Act (the "Lanham Act"), 15 U.S.C. §§ 1114 and 1125(a) and (c), common law trademark infringement and unfair competition, and breach of contract.  DTS seeks injunctive relief, monetary damages, and other appropriate relief.

2.     These claims arise out of an express agreement between DTS and NERO: the DTS, Inc. Digital Surround Manufacturer Software License Agreement, effective July 20, 2006, as amended by (i) Amendment to Manufacturer Software License Agreement between DTS, Inc., and NERO AG, effective November 20, 2006; (ii) DTS-HD Manufacturer Software License Agreement Amendment, effective November 20, 2006; (iii) Mandatory DVD Player Amendment, effective November 20, 2006; (iv) First Amendment to Mandatory DVD Player Amendment (PC OEM Application), effective November 20, 2006; (v) Fifth Amendment to Manufacturer Software License Agreement between DTS, Inc., and NERO AG, effective March 21, 2007; (vi) Sixth Amendment to Manufacturer Software License Agreement between DTS, Inc., and NERO AG (Free Trial Download Program), effective May 7, 2008; (vii) Seventh Amendment to Manufacturer Software License Agreement between DTS, Inc., and NERO AG, effective April 3, 2007; (viii) Eighth Amendment to Manufacturer Software License Agreement between DTS, Inc., and NERO AG (Mandatory BD Player Amendment), effective January 5, 2010; and (ix) Ninth Amendment to Manufacturer Software License Agreement between DTS, Inc. and NERO AG (PC OEM Application), effective January 5, 2010 (collectively, the "Agreement"), and NERO's distribution of certain software products in violation of the Agreement

1  and failure to report to DTS the sales of certain software products in violation of

2  the Agreement.

3      3.      These claims also arise out of NERO's knowing and willful violation

4  of DTS' rights in its distinctive trademarks, which DTS uses and licenses for use in

5  connection with computers, computer programs for use in audio processing,

6  computer software for encoding or decoding audio for use with CDs and DVDs,

7  computer software for processing digital music files, computer software to control

8  and improve computer and audio equipment sound quality, software to control and

9  improve audio equipment sound quality, and software for digital audio encoding,

10  recording, decoding and playback of digital audio, among other things.

11      4.      Specifically, NERO has used the DTS trademarks on the media player

12  of its standard versions of at least its Multimedia Suite 10, NERO 11, NERO 12,

13  and NERO 14 video editing and authoring software products (collectively, the

14  "Standard NERO products") without paying royalties pursuant to the terms of the

15  Agreement.   NERO also continues to use the DTS trademarks on its software

16  products, including but not limited to NERO Multimedia Suite 10 Platinum, NERO

17  Video Premium HD, NERO 11 Platinum, NERO 12 Platinum, and NERO 14

18  Platinum video editing and authoring software products (collectively, the

19  "Platinum NERO products") and Standard NERO products, following termination

20  of the Agreement.   NERO is therefore improperly using, copying or infringing

21  and/or diluting DTS' valid and protectable trademarks.   NERO's use of DTS'

22  trademarks constitutes infringement, false designation of origin and unfair

23  competition.

24                    **PARTIES**

25      5.      Plaintiff DTS is a corporation organized under the laws of Delaware,

26  with its principal place of business at 5220 Las Virgenes Road, Calabasas,

27  California 91302.

28

-2-

6.     On information and belief, Defendant NERO is organized under the laws of Germany, with its principal place of business at Im Stoeckmaedle 18, Karlsbad, D-76307 Germany, and with offices in Japan, China, and at 330 N. Brand Blvd., Suite 800, Glendale, California 91203.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of these claims under 15 U.S.C. §§ 1114, 1116, 1117, 1121 and 1125(a) and (c) as well as under 28 U.S.C. §§ 1331, 1332, and 1338.  NERO is a foreign corporation and the matter in controversy exceeds the sum of $75,000.  This Court also has jurisdiction over the state law claims under 28 U.S.C. §§ 1338(b) and 1367 and principles of supplemental and pendent jurisdiction. The state law claims form part of the same case or controversy as DTS' federal trademark law claims.

8.     NERO is subject to personal jurisdiction in this Court because it transacts business in, and has substantial contacts within this district and because its conduct will cause or is causing injury to DTS in this district.  NERO is also subject to jurisdiction in this Court because NERO consented to jurisdiction in this Court under Section 25.9 of the Agreement.

9.     Venue is proper in this Court under 28 U.S.C. § 1391 because NERO does business in this district and a substantial part of the events giving rise to this litigation occurred in this district, including the marketing and sale of the infringing products.

## STATEMENT OF THE CASE

### A.     DTS' Digital Audio Technology and Trademarks

10.    DTS is a leading provider of high-quality digital multi-channel audio technology, products, and services for entertainment markets worldwide.  DTS' award-winning audio technology delivers compelling surround sound for consumer electronics applications, including home theaters and high-end car audio.

11.   DTS' principal audio technology (the "DTS Technology") uses a proprietary algorithm to compress and encode an original film soundtrack so that the compressed and encoded data can be placed onto a medium such as a DVD or Blu-ray disc.  The DTS Technology then decodes and decompresses the soundtrack when the medium is played back in a device such as a DVD player or a Blu-ray disc player of a personal computer.  The DTS Technology is broadly protected by worldwide patents, trademarks, copyrights, and know-how.

12.   Since at least as early as May 1993, DTS has continuously used the highly distinctive trademark DTS® to market and sell its audio products and DTS Technology throughout the United States and the world.

13.   DTS has developed and extensively promoted the DTS® mark and related marks and the products that carry its marks.  As a result of DTS' efforts, the public has come to recognize and rely upon DTS' marks as an indication of the high quality associated with DTS' audio technology in consumer electronic products and software.

14.   In addition to DTS' own advertising efforts, many unsolicited stories in national publications have highlighted the quality and popularity of DTS' pioneering audio technology.  Since 1997, with the laserdisc release of *Jurassic Park*, DTS sound technology has been available to enhance the home theater experience and has become commonly used in the DVD and Blu-ray releases of major motion pictures.  Almost every movie watcher—whether sitting at home or in a movie theater—has seen the DTS marks and logos flash across the screen as a prelude to a movie.

15.   As a result of DTS' long-term and widespread use of the DTS marks and logos in the United States via Internet, television, and print advertising, and continuous and unsolicited media coverage, the DTS marks enjoy a high degree of consumer recognition and have become famous marks.

16.     On April 20, 1999, the United States Patent & Trademark Office ("PTO") issued to DTS (then named "Digital Theater Systems, Inc.") U.S. Trademark Registration No. 2,240,960 for the mark DTS in connection with "digital video disc players, compact disc players and laser disc players."  A true and correct copy of this registration is attached as Exhibit A.

17.     On April 27, 2010, the PTO issued to DTS U.S. Trademark Registration No. 3,782,713 for the mark DTS with the design of curved line overlapping circles in connection with, among other things, "…computer firmware for use in audio processing; computer game software; computer programs for use in audio processing;[] computer software for encoding or decoding audio for use with CDs and DVDs; computer software for processing digital music files; computer software to control and improve computer and audio equipment sound quality… software to control and improve audio equipment sound quality; software for digital audio encoding, recording, decoding and playback of digital audio…" A true and correct copy of this registration is attached as Exhibit B.

18.     On August 27, 2013, the PTO issued to DTS U.S. Trademark Registration No. 4,390,638 for the mark DTS with the design of curved line overlapping circles in connection with, among other things, "audio circuit boards; audio mixers; computers; computer game programs; computer game software; [and] computer programs for use in audio processing..."   A true and correct copy of this registration is attached as Exhibit C.

19.     DTS is the owner of all right, title, and interest in and to the DTS registrations.  The DTS registrations are in full force and effect on the PTO's Principal Register.  Pursuant to 15 U.S.C. § 1057(b), the registration certificate for the DTS marks constitutes prima facie evidence of the validity of that registration, or DTS' ownership in the marks, and of DTS' exclusive right to use that mark in commerce and in connection with the goods and services specified in the certificate.

20.    Pursuant to 15 U.S.C. § 1065, DTS' right to use U.S. Trademark Registration No. 2,240,960 has become legally incontestable.

21.    DTS licenses its patents, trademarks, copyrights, and know-how protecting the DTS Technology, including U.S. Trademark Registration Nos. 2,240,960; 3,782,713; and 4,390,638 to software manufacturers, such as NERO.

**B.    NERO Makes and Sells Software Using DTS' Intellectual Property**

22.    NERO is a German corporation with international locations in Japan, China and Glendale, California.  NERO manufactures and sells a variety of video editing and authoring software products, including, for example, its Standard NERO products and Platinum NERO products.

23.    On information and belief, at least the Platinum NERO products are capable of decoding DTS audio data encoded on a DVD or Blu-ray disc.  NERO sells its Platinum NERO products as (i) a software product (hereinafter, a "Licensed Software Product" or "LSP") available through retail stores or on its website, (ii) as a product that bundles the LSP with a personal computer that does not bear the DTS trademark (hereinafter, "Hardware Product" or "HP"), and/or (iii) as a product that bundles the LSP with hardware other than a personal computer that bears the DTS trademark and has been certified by DTS (hereinafter, "Certified Hardware Product" or "CHP").

**C.    DTS and NERO Enter the Agreement**

24.    In 2006, NERO entered into its Agreement with DTS.   The Agreement grants NERO the right to make LSPs, HPs and CHPs that use the DTS Technology.  *See, e.g.,* Agreement at § 2.1, 2.2, 2.3.  The Agreement requires that each NERO LSP that contains the DTS Technology be secure so that each copy of the LSP is capable of being used on only one personal computer, among other requirements.  *See, e.g., id.* at §§ 1.10 and 2.3.  The Agreement further allows NERO to use DTS' trademarks and logos in connection with the LSPs, HPs and

-6-

CHPs that use the DTS Technology.  *See, e.g., id.* at §§ 2.2, 2.3, 4.2, 8.1. However, the Agreement specifically excludes the right to use DTS' trademarks and logos with any NERO products other than LSPs, HPs and/or CHPs that use the DTS Technology.  *See, e.g., id.* at §§ 4.2, 8.1.

25.    In consideration for using the DTS Technology, NERO agreed to pay royalties for each LSP, HP and CHP using the DTS Technology.  *See, e.g., id.* at § 15.5.1.  To facilitate DTS' collection of royalties, the Agreement requires NERO to report to DTS all sales of LSPs, HPs and CHPs on a quarterly basis.  *See, e.g., id.* at § 16.1.  To police NERO's reporting obligations, the Agreement entitles DTS to conduct an annual independent audit of NERO's books and records.  *See, e.g., id.* at § 19.1.  The Agreement further provides that should an audit reveal that NERO inaccurately reported or failed to meet material obligations of the Agreement, NERO is required to pay DTS' expenses and costs of the audit.  *See, e.g., id.* at § 19.1.

**D.    NERO's Breach of the Agreement**

26.    In 2013, DTS audited NERO's sales for the period Q3 2011 to Q2 2013, pursuant to Section 19.1 of the Agreement.  The audit revealed that NERO had materially breached the Agreement in at least three ways.  First, NERO had failed to report or pay royalties on the sales of all LSPs that had been "activated." By failing to report and pay royalties on the sales of all of its LSPs using the DTS Technology, NERO materially breached Sections 15 and 16 of the Agreement.

27.    Second, the audit revealed that NERO's LSPs that contain the DTS Technology were not secure and that individual LSP activation codes had been used multiple times to install and activate a NERO LSP using DTS' functionality. Further investigation by DTS revealed that the same activation code could be used to install a single LSP on multiple personal computers.  NERO, however, failed to report or pay royalties on the subsequent installations and activations of the individual LSP activation codes.  By failing to manufacturer a secure LSP and by

-7-

1    failing to report and pay royalties on subsequent installations and activations of the
2    NERO LSPs, NERO materially breached Sections 1.10, 2.3, 15 and 16 of the
3    Agreement.

4    28.    Third, the audit revealed that NERO was not reporting or paying
5    royalties on the sales of all LSPs.  DTS' investigation revealed that even non-
6    activated installations of at least the NERO 11 Platinum and NERO 12 Platinum
7    products are capable of decoding DTS 5.1 audio data encoded on DVDs.    NERO
8    promoted and marketed the DTS capability in the NERO 11 Platinum and NERO
9    12 Platinum LSPs through at least the use of DTS' trademarks and logos on the
10   retail box and on the software media player, as shown in the following images:




26   29.    Therefore, all NERO 11 Platinum and NERO 12 Platinum products -
27   activated or not - are LSPs and are subject to royalty payments.  However, the audit
28   revealed that NERO had failed to report and pay royalties on the sales of all of its

-8-

NERO 11 Platinum and NERO 12 Platinum LSPs using the DTS Technology and trademarks. Instead, NERO paid royalties on only the subset of LSPs that had been "activated" by a user.  Accordingly, by failing to report and pay royalties on all NERO 11 Platinum and NERO 12 Platinum LSPs, NERO materially breached Sections 15 and 16 of the Agreement.

30.    DTS' investigation revealed that non-activated installations of NERO Multimedia Suite 10 Platinum, NERO Video Premium HD, and NERO 14 Platinum are capable of decoding DTS 5.1 audio data encoded on DVDs. NERO promoted and marketed the DTS capability in the NERO Multimedia Suite 10 Platinum, NERO Video Premium HD, and NERO 14 Platinum LSPs through at least the use of DTS' trademarks and logos on the software media player. Therefore, all NERO Multimedia Suite 10 Platinum, NERO Video Premium HD, and NERO 14 Platinum products - activated or not - are LSPs and are subject to royalty payments.  Instead, NERO paid royalties on only the subset of these LSPs that had been "activated" by a user.

31.    Finally, DTS' investigation revealed that NERO has promoted and marketed its Standard NERO products as using the DTS Technology by prominently displaying the DTS trademarks and logos on the software media player of the Standard NERO products.  For example, the NERO 12 media player prominently displays the DTS trademark:

1

2

3

4

5

6

7

8

9



10    32.    However, NERO failed to report and pay royalties on the sales of any

11   of its Standard NERO products.  Accordingly, by failing to report and pay royalties

12   on its Standard NERO products, NERO materially breached Sections 15 and 16 of

13   the Agreement.

14    **E.    DTS Terminated NERO's License Agreement**

15    33.    By letter dated December 18, 2013, DTS notified NERO that NERO

16   had materially breached the Agreement and requested NERO cure its breaches by

17   payment of past royalties.

18    34.    NERO and DTS discussed the issues raised in DTS' letter in

19   subsequent correspondence.  NERO agreed it owed royalties for the unreported

20   sales of activated LSPs using the DTS Technology and DTS' expenses relating to

21   the audit, however, NERO refused to pay royalties owed for the multiple

22   installations and activations of the additional LSPs that were promoted and capable

23   of decoding DTS 5.1 audio data without activation.

24    35.    In light of NERO's continued breaches of, and uncured defaults

25   under, the Agreement, DTS notified NERO by letter dated August 8, 2014, that the

26   Agreement was terminated pursuant to Section 22.2, effective immediately.

27    **F.    NERO's Unlawful Use of the DTS Trademarks**

28

COMPLAINT AND DEMAND FOR JURY TRIAL

36.     Since at least 2006, NERO has been aware of DTS' trademarks and logos.  In 2006, NERO entered into its Agreement with DTS.  The Agreement allows NERO to use DTS' trademarks and logos in connection with the LSPs, HPs and CHPs that use the DTS Technology.  *See, e.g.,* Agreement at §§ 2.2, 2.3, 4.2, 8.1.  However, the Agreement specifically excludes the right to use DTS' trademarks and logos with any NERO products other than LSPs, HPs and/or CHPs that use the DTS Technology.  *See, e.g., id.* at §§  4.2, 8.1.

37.     Pursuant to the Agreement, NERO has promoted and marketed  its Standard NERO products and Platinum NERO products as using the DTS Technology by prominently displaying the DTS trademarks and logos on its retail boxes, software media player, and/or website and other marketing materials. On information and belief, these NERO products are, or have been, available for purchase in retail stores across the United States and online from NERO and other retailers.

38.     NERO's nationwide use of the DTS trademarks and logos in connection with the Standard NERO products without payment of royalties under the Agreement constitutes commercial trademark use in commerce and infringement of DTS' trademarks and threatens serious injury to DTS and the public.

39.     NERO's nationwide use of the DTS trademarks and logos in connection with the Standard NERO products and Platinum NERO products since the termination of the Agreement constitutes commercial trademark use in commerce and infringement of DTS' trademarks and threatens serious injury to DTS and the public.

40.     NERO's use of the DTS trademarks is likely to cause consumer confusion, dilute and tarnish DTS' trademarks, and constitute unfair competition. NERO is further confusing customers regarding NERO's lack of authorization to manufacture, market and sell software products that support DTS Technology.  As

-11-

a result, NERO is damaging DTS' goodwill and reputation of its technology and intellectual property.

41.    Despite undermining DTS' efforts to maintain the quality of its trademarks, and despite having had its rights to use those trademarks on certain products terminated along with the Agreement, NERO has nonetheless continued to use DTS' trademarks in marketing its products.  Indeed, NERO has used and, on information and belief, continues to use DTS' trademarks when marketing its new software to consumer customers on its retail packaging and on its website.

42.    On information and belief, NERO's acts are and have been committed with prior notice and knowledge of DTS' registered trademarks.

43.    On information and belief, NERO's unlawful conduct as set forth herein has been and continues to be willful, deliberate, and in bad faith and reflects an intent to confuse consumers and profit from the goodwill and consumer recognition associated with DTS' trademarks.

## FIRST CAUSE OF ACTION

### Federal Trademark Infringement

### (15 U.S.C. § 1114)

44.    DTS refers to and incorporates paragraphs 1 through 43 inclusive, as though fully set forth herein.

45.    DTS owns U.S. Trademark Registration Nos. 2,240,960; 3,782,713; and 4,390,638.

46.    NERO has used, and continues to use DTS' U.S. Trademark Registration Nos. 2,240,960; 3,782,713; and 4,390,638 in connection with the sale, offering for sale, distribution, and advertising of products and services in a manner that is likely to cause or has caused confusion, mistake and deception as to the source, origin and authenticity of the goods.

47.    The actions of NERO described above and specifically, without limitation, their unauthorized use of the DTS trademarks, in commerce to

advertise, promote, market, and sell NERO's products throughout the world and the United States, including California, constitute trademark infringement in violation of 15 U.S.C. § 1114.

48.     The actions of NERO, if not enjoined, will continue.  DTS is therefore entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

49.     DTS has suffered, and continues to suffer, damages in an amount to be proven at trial consisting of, among other things, diminution in the value of and goodwill associated with the DTS trademarks and injury to DTS' business. Pursuant to 15 U.S.C. § 1117(a), Plaintiff is entitled to recover damages, in an amount to be determined at trial, including any and all profits NERO may have made as a result of its wrongful conduct.  Alternatively, DTS is entitled to statutory damages under 15 U.S.C. § 1117(c).  Further, DTS is informed and believes, and on that basis alleges, that the actions of NERO were undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling DTS to recover treble damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(b).  Alternatively, the award of statutory damages should be enhanced in accordance with 15 U.S.C. § 1117(c).

## SECOND CAUSE OF ACTION

### Federal Trademark Dilution

### (15 U.S.C. § 1125(c))

50.     DTS refers to and incorporates paragraphs 1 through 49 inclusive, as though fully set forth herein.

51.     The actions of NERO described above and specifically, without limitation, their unauthorized use of the famous DTS trademarks in commerce to advertise, market and sell NERO products throughout the world and the United States, including California, are likely to cause dilution by blurring and tarnishment in violation of 15 U.S.C. § 1125(c).

-13-

52.     The actions of NERO, if not enjoined, will continue.   DTS has suffered, and continues to suffer, damages in an amount to be proven at trial consisting of, among other things, diminution in the value of and goodwill associated with DTS' trademarks, and injury to DTS' business.   Plaintiff is therefore entitled to injunctive relief pursuant to 15 U.S.C. § 1116 and 15 U.S.C. § 1125(c).

53.     On information and belief, the actions of NERO described above were and continue to be deliberate and willful.  Plaintiff is therefore entitled to recover damages in an amount to be determined at trial, profits made by NERO on sales of NERO products, and the costs of this action pursuant to 15 U.S.C. § 1117.

## THIRD CAUSE OF ACTION

### Federal False Designation of Origin and Unfair Competition

### (15 U.S.C. § 1125(a))

54.     DTS refers to and incorporates paragraphs 1 through 53 inclusive, as though fully set forth herein.

55.     Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1), provides in pertinent part:

> (a)(1)  Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
>
> (A)  is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person…
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

-14-

56.     NERO's actions described above constitute false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a), because it constitutes commercial use in commerce of words, names, and false designations of origin that are likely to cause confusion, mistake, and deception as to the affiliation, connection, or association of DTS with NERO, or vice versa; as to the origin of NERO's software with DTS, or vice versa; as to the sponsorship or approval of NERO's software by DTS, or vice versa; and misrepresents the nature, characteristic and qualities of NERO's products, and accordingly constitutes unfair competition and infringement of DTS' trademarks.

57.     On information and belief, NERO's foregoing acts have been, and continue to be, willful and deliberate.

58.     DTS is being irreparably damaged by NERO's violation of  15 U.S.C. § 1125(a), and it has no adequate remedy at law.  Unless constrained by this Court, the violation will continue to injury DTS and the public.

## FOURTH CAUSE OF ACTION

### Common Law Trademark Infringement and Unfair Competition

59.     DTS refers to and incorporates paragraphs 1 through 58 inclusive, as though fully set forth herein.

60.     NERO's use of the DTS trademarks in connection with its software products is in violation of the common law, including the common law of California, because it constitutes common law trademark infringement and unfair competition.

61.     On information and belief, NERO's foregoing acts have been, and continue to be, willful and deliberate.

62.     DTS is being irreparably damaged by NERO's violation of DTS' common law rights, and it has no adequate remedy at law.  Unless constrained by this Court, the violation will continue to injure DTS and the public.

# FIFTH CAUSE OF ACTION

## Breach of Contract

63.     DTS refers to and incorporates paragraphs 1 through 62 inclusive, as though fully set forth herein.

64.     The Agreement is a valid contract.   The terms of the Agreement provide, in pertinent part, that:

(a)     "DTS hereby grants to [NERO], and [NERO] accepts: A personal, non-transferrable, indivisible and non-exclusive license throughout the world under the PATENT RIGHTS, subject to the payment of royalties as provided herein, to make: (i) LICENSED SOFTWARE PRODUCT ("LSP"); and (ii) the HARDWARE PRODUCT ("HP"); and (iii) the CERTIFIED HARDWARE PRODUCT ("CHP"), and to use, lease and sell the same, within the home media center sector of the personal computer market…"   Agreement at § 2.1.

(b)     "DTS hereby grants to [NERO], and [NERO] accepts…A personal, non-transferable, indivisible and non-exclusive license throughout the world…to use the KNOW-HOW and the TRADEMARK in connection with the design, manufacture, identification, advertising, offering for sale or lease and sale or lease of the LSP, HP and/or CHP…" *Id.* at § 2.2.

(c)     "DTS further grants to [NERO] an individual, non-exclusive, nontransferable, non-sublicensable, worldwide license under DTS PATENTS, KNOW-HOW, and LICENSED COPYRIGHTED WORKS to: … (ii) use and manufacture LSPs, provided that (A) such software is SECURE…(iii) to use the Trademark to mark each LSP and/or CHP and associated packaging and other materials of the LSP, HP and/or CHP, as applicable.; and (iv) to use the Trademark in connection with the advertising and sale of LSP, HP and CHP." *Id.* at § 2.3.

(d)     "The TRADEMARK may not be used on or in reference to any products other than LSP, HP and/or CHP." *Id.* at § 4.2.

(e)     "SECURE shall mean…(iii) such LSP or HP will be secure, such that each copy of the LSP is capable of being used on, and in conjunction with, one and only one specific and individual personal computer, without the potential for subsequent duplication." *Id.* at § 1.10.

(f)     "[NERO] shall prominently mark the LSP and/or CHP with the TRADEMARK in accordance with DTS' guidelines which may be updated from time to time.  The TRADEMARK may not be used on or in reference to any products other than LSP and/or CHP." *Id.* at § 8.1.

(g)     "…for each LSP incorporating (i) the DTS 5.1 core technology and/or (ii) the DTS-HD Master Audio Suite technology for standard definition DVD playback, Blu-ray disc playback, HD-DVD playback or any combination thereof, regardless of

-16-

whether manufactured for LSP, HP or CHP, [NERO] shall pay DTS the following royalties…"  *Id.* at § 15.5.1.

(h)   "[NERO] shall make separate quarterly statements on or before the 30th day of January, April, July and October of each year showing separately, broken up by LSP, HP and/or CHP, as applicable, (i) the quantity of each type of such product manufactured during the preceding calendar quarter, (ii) the suggested retail price for such product; (iii) the country of manufacture for such product; (iv) the applicable retail part number for such product, and (v) the applicable royalties due." *Id.* at § 16.1.

(i)   "[NERO] shall accompany such statements with the payment in U.S. dollars of all sums due DTS…" *Id.* at § 16.2.

(j)   "DTS shall have the right to, and [NERO] agrees that DTS may, at DTS's expense, appoint an independent third party auditor…to inspect, examine, audit and make abstracts of all of [NERO's] books, records, accounts, production data and other information as may potentially contain information bearing upon or related, but not limited to: (i) LSP, HP and/or CHP; (ii) attributes of a LSP, and (iii) unique customer identification codes, and (iv) [NERO's] identification data, and (v) TRADEMARK usage, and (vi) SECURITY of the LSP and CHP and breaches thereof, and (vii) the number of LSP, HP and/or CHP manufactured, shipped, sold or otherwise disposed of, and (viii) the identity of the party, including distributors, receiving the LSP, HP and/or CHP…If such examination and inspection shows that [NERO] has inaccurately reported or failed to meet its material obligations set forth in this Agreement, then in addition to other obligations [NERO] may have hereunder, [NERO] shall be liable to DTS for all expenses of such examination and inspection." *Id.* at § 19.1.

(k)   "If [NERO] shall at any time default in rendering any of the statements required hereunder, or in fulfilling any other obligations or conditions of this Agreement, DTS shall have the right to cancel this Agreement immediately by giving [NERO] written notice of cancellation." *Id.* at § 22.2.

(l)   "The applicable law governing any course of action arising out of this Agreement, or the performance by either Party hereto, shall be governed by the laws of the State of California, U.S.A without regard to its conflicts of laws provisions.  The parties irrevocably consent to the jurisdiction of the state and federal courts of the State of California, county of Los Angeles for the resolution of any disputes hereunder." *Id.* at § 25.9.

65.   DTS has performed each and every obligation required of it under the Agreement (including giving the required notice of NERO's defaults and adequate opportunity to cure the same), except such obligations as were excused by NERO's failures of performance and breaches of the Agreement.

-17-

66.    As set forth above, NERO breached its obligations under the Agreement by, among other things: (a) failing to report and pay royalties on the sales of all activated LSPs using the DTS Technology; (b) failing to manufacturer a secure LSP and by failing to report and pay royalties on subsequent installations and activations of the individual LSP activation codes; (c) failing to report and pay royalties on all un-activated installations of  LSPs using the DTS Technology and trademarks; and (d) failing to report and pay royalties on all Standard NERO products using the DTS trademarks.

67.    On information and belief, NERO failed to report and pay royalties on the sales of many other LSPs during the term of the Agreement.

68.    DTS is informed and believes, and on that basis alleges that NERO knowingly concealed sales of its products that use the DTS Technology and/or trademarks.  As a result, NERO has also breached the covenant of good faith and fair dealing implied in every contract.

69.    On information and belief, NERO's conduct emanated from its headquarters in Germany and/or its office in Glendale, California, and/or intended to harm California residents, including DTS, and is therefore subject to California law.  In addition, the Agreement provides that the applicable law governing any dispute arising out the Agreement shall be California law.  *See, e.g.,* Agreement at § 25.9.

70.    As a direct and proximate result of NERO's breaches of the Agreement, DTS has lost over $1 million dollars in potential royalties and goodwill.

## **PRAYER FOR RELIEF**

WHEREFORE, DTS prays for the following relief:

(1)    For a judgment that NERO infringed DTS' trademarks under 15 U.S.C. §§ 1114;

(2) For a judgment that NERO diluted DTS' trademarks under 15 U.S.C. § 1125(c);

(3) For a judgment that NERO engaged in unfair competition and false designation of origin under 15 U.S.C. § 1125(a);

(4) For a judgment that NERO engaged in common law trademark infringement and unfair competition;

(5) For a preliminary and permanent injunction enjoining NERO, their subsidiaries, officers, agents, servants, employees and those persons in active concert or participation with them, or any of them, from infringing and/or diluting DTS' trademarks and from engaging in unfair competition or false advertising regarding them;

(6) For an order awarding DTS its damages resulting from NERO's infringement and dilution of its trademarks, as well as their unfair competition and false designations, together with interest and a judgment that NERO's infringement was willful and that the damages awarded to DTS should be trebled under 15 U.S.C. § 1117, Section 35 and California law;

(7) For a judgment that this case is exceptional under 15 U.S.C. § 1117(a);

(8) For an order awarding DTS its costs and attorneys' fees under 15 U.S.C. § 1117(a);

(9) For an order awarding DTS its damages resulting from NERO's breaches of the Agreement;

(10) For an accounting of all NERO LSPs sold during the term of the Agreement and for payment of all monies due to DTS as a result of that accounting;

(11) For an order awarding DTS its costs and expenses resulting from the audit pursuant to the Agreement;

-19-

1    (12)   For an order under FED. R. CIV. P. 54(d)(1) awarding DTS all costs

2           and expenses of this action;

3    (13)   For an order awarding DTS prejudgment and post-judgment interest;

4    (14)   For an order requiring NERO to file with the Court and serve DTS'

5           counsel a report setting forth the manner and form of NERO's

6           compliance with the Court's orders; and

7    (15)   For such other and further relief as this Court may deem just and

8           proper.

9

10   DATED: August 22, 2014                    Respectfully submitted,

11

12                                              COVINGTON & BURLING LLP

13                                              By: /s/ Christopher K. Eppich
                                                Alan H. Blankenheimer
14                                              Christopher K. Eppich

15                                              Attorneys for Plaintiff
                                                DTS, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1

## **DEMAND FOR JURY TRIAL**

2        DTS demands a jury trial on all issues triable by jury pursuant to FED. R.

3    CIV. P. 38.

4    DATED: August 22, 2014          Respectfully submitted,

5

6                        COVINGTON & BURLING LLP

7                        By: /s/ *Christopher K. Eppich*
                         Alan H. Blankenheimer
8                        Christopher K. Eppich

9                        Attorneys for Plaintiff
                         DTS, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL